R. B. COTTONREADER, Rosa Lee Lewis, Fannie Lee Marsh, Margaret Rogers, Charles Cheatham, Emmett Knight, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Elton JOHNSON, individually and as Mayor of Greenville, Alabama, E. B. Stafford, individually and as Chief of Police of Greenville, Alabama, W. Thomas, individually and as Sheriff of Butler County, Alabama, their agents, servants, employees, successors, and all persons in active concert and participation with them, Defendants.

Civ. A. No. 2266–N.

United States District Court
M. D. Alabama, N. D.

April 5, 1966.

Fred D. Gray, Solomon S. Seay, Jr., Montgomery, Ala., Jack Greenberg, Norman C. Amaker, Charles H. Jones, Jr.,

Charles Stephen Ralston, New York City, for plaintiffs.

Calvin Poole, of Poole & Poole, Greenville, Ala., for defendants.

JOHNSON, District Judge.

The plaintiffs, as Negro residents or citizens of Butler County, Alabama, and the members of the class they represent, filed with this Court on August 27, 1965, their complaint, motion for a temporary restraining order, and motion for a preliminary injunction. This Court by formal order on August 31, 1965, denied plaintiffs' request for a temporary restraining order, which was sought without notice to the defendants and without this Court's hearing any testimony in support thereof. Jurisdiction is invoked by the plaintiffs pursuant to 28 U.S.C. § 1343(3) and (4). This action, authorized by 42 U.S.C. § 1971, as amended in 42 U.S.C. §§ 1981, 1983, seeks relief from the denial of the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States and seeks redress of the deprivation of rights, privileges, and immunities guaranteed by the First, Fourteenth, and Fifteenth Amendments to the Constitution of the United States as implemented by congressional enactments. The defendants in their answer filed September 17, 1965, specifically deny that the plaintiffs, or any members of the class they represent, have been denied equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States and deny that there has been any deprivation of rights, privileges, and immunities guaranteed these plaintiffs, or any members of their class, under any provision of the Constitution of the United States. On November 15, 1965, the defendants, by leave of this Court, amended their answer previously filed and also counterclaimed against the plaintiffs and the members of the class they represent. In the counterclaim, the defendants ask that these plaintiffs and the other members of their class be enjoined and restrained from any marching, demonstrating, or any other conduct which might unlawfully obstruct traffic and constitute an undue burden on the lawful traffic on the streets of the City of Greenville, Alabama, from interfering with the transportation of pupils from and to the public schools of Greenville and Butler County, Alabama, and from trespassing upon school property and interfering with classroom activities in the schools of the City of Greenville and Butler County, Alabama.[1]

Plaintiffs' motion for a preliminary injunction against the defendants and the defendants' motion for a preliminary injunction against the plaintiffs were submitted upon the pleadings, the testimony of numerous witnesses and the several exhibits offered and admitted in connection with that testimony. Upon this submission, this Court now proceeds in this memorandum opinion to make appropriate findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

The defendant Elton Johnson is Mayor of Greenville, Butler County, Alabama, and as such is engaged in the enforcement and execution of the laws of the State of Alabama and the ordinances of the City of Greenville; the defendant E. B. Stafford is Chief of Police of Greenville, Alabama, and as such is engaged in the enforcement of the laws of the State of Alabama and the ordinances of the City of Greenville, and generally directs and supervises the official activities and conduct of the members of the police force of Greenville, Alabama; the defendant W. Thomas is the Sheriff of But-

---

1. This amendment and counterclaim were authorized to be filed over the objection of the plaintiffs, but with the stipulation by the Court that the plaintiffs would have the opportunity at the close of the taking of the evidence in this case to move this Court for a continuance for the purpose of offering any further testimony they might have that related to the matters involved in the counterclaim. At the close of the taking of the evidence in this case, this offer was renewed, but the attorneys for the plaintiffs declined the invitation, stating that they had nothing further to offer.

ler County, Alabama, and as such is engaged in the enforcement of the laws of the State of Alabama and Butler County.

The plaintiff R. B. Cottonreader, Jr., presently residing in Greenville, Alabama, is employed on a full-time basis for the Southern Christian Leadership Conference as a "County Project Director." His duties are primarily to organize "We Want Freedom" clubs in Greenville and Butler County, Alabama, and to use these clubs and the members thereof to stimulate interest among the Negro community in registering to vote, voting, securing desegregation of public facilities and, generally, obtaining "equal rights" for Negroes. Cottonreader's duties also involve organizing protest marches if considered necessary for the purpose of impressing upon the appropriate officials the deprivation of these rights for members of the Negro race. Under Cottonreader's direction, the other plaintiffs are engaged in the same activities in Greenville and Butler County, Alabama.

In June, 1965, Cottonreader and others engaged with him in his community organization project in Greenville escorted various Negro citizens to the public county courthouse for the purpose of registering them to vote. Cottonreader met with some resistance by the sheriff and his deputies in this endeavor.[2] For the purpose of stimulating the interest of the Negroes, and also for the purpose of protesting discriminatory practices on the part of these defendants and other public officials of Butler County, Alabama, these plaintiffs and other members of their class on or about August 1, 1965, commenced organized public demonstrations. These protest demonstrations took the form of marches or parades from a designated point in the City of Greenville to the Butler County Courthouse, also located within the city. On August 1 Cottonreader and his organization applied to the city officials for a parade permit; this was denied. The demonstration was organized anyway and scheduled for August 3. On August 3 approximately 150 Negroes started marching from their organizational point, a chinaberry tree near the intersection of Perdue Street and South Park Street northward along South Park Street toward Commerce Street, the main street in Greenville, Alabama. Their destination was the county courthouse, which was to be reached by turning eastward on Commerce Street for approximately four blocks. Prior to the time the group reached Commerce Street, several policemen, the city attorney, and a considerable number of deputies stopped the march. The city attorney declared the march to be an "unlawful assembly"; whereupon, the marchers, confronted by these officers, sat down and commenced to sing "freedom" songs. They were ordered to disperse and leave. Upon their failure to do so, the officers fired tear gas into the group of approximately 150 Negroes. Several of the Negroes were injured. On the following day, August 4, another protest demonstration was organized and commenced. This demonstration was likewise declared to be an "unlawful assembly." The Negroes were surrounded by a large group of whites, most of whom wore civilian clothes and helmets and carried billy clubs. The city officials placed a barricade across the street, and the Negro marchers made no attempt to overrun the barricade. They were again gassed, and again some of them were injured.

August 16 and 17 were two regular registration days under the Alabama law.[3] One hundred thirty Negroes were registered on August 16 and 180 Negroes

---

2. The total population of Butler County, Alabama, is 24,560 according to the 1960 census; 44.7% of this population is Negro; the voting-age population, according to this census in 1960, was 8,363 white and 4,820 Negro. The statistics available to this Court that have been presented and accepted as true and consti- tuted findings of fact in other cases heretofore determined in this district reflect that as of April, 1964, the total registration of white citizens to vote was 6,905, of Negro citizens, 525.

3. Under Alabama law, registration is a prerequisite to voting in any election.

were registered on August 17. On August 16 approximately 350 to 400 Negroes came to the Butler County Courthouse for the purpose of attempting to register. Considerable confusion ensued, but by the next day this was eliminated by the appropriate officials, at which time lines were formed and the registration proceeded in a more orderly manner.

The activities of Cottonreader and his group were extended, and on August 21, 1965, approximately six to eight Negroes commenced to picket Elmore's Variety Store located in downtown Greenville, Alabama. No application for permission to picket was made by Cottonreader or any of the other Negroes participating in the picketing. This picketing was in an orderly manner; no entrances were blocked. The pickets marched in front of the store in a single file. There was no interference with the customers, and the alleged discriminatory hiring practices of the Elmore store were called to the attention of the public by the pickets' carrying signs to the effect that "Jim Crow Must Go," "We Want Freedom," and other signs of a like nature. Several police officers and members of the sheriff's office were present and observed the picketing. While this was going on, a considerable number of white civilians were permitted to gather at or near the site of the picketing. Taunts and threats ensued, and one or more of the pickets appealed to the city authorities for protection. This protection was refused and withheld; whereupon one of the pickets, a Negro named Cheatham, was kicked and beaten by three unknown whites, with one or more members of the Greenville Police Department at or near the place where the assault occurred; these still unidentified whites were not arrested. During this period the plaintiffs organized and conducted several marches from their organizational point near the intersection of Perdue Street and South Park Street. These marches would proceed in an orderly direction along South Park Street for approximately seven blocks and then in an easterly direction along Commerce Street, the city's main thoroughfare, to the Butler County Courthouse. Upon these occasions the march along Commerce Street would cover approximately four blocks from the intersection of South Park Street and Commerce Street to the courthouse. Upon some of these occasions, applications for parade permits were made and granted. Upon other occasions, no applications were made, and, on still other occasions, applications for permits would be made and refused, but the parades would take place anyway. Upon some of these occasions the plaintiffs would march in disregard of traffic signals, and vehicular and pedestrian traffic would be unduly blocked and impeded. Upon still other occasions, white civilians would be permitted to congregate at or near the place where the marching and demonstrating was taking place. These white civilians would at times be armed with knives, brass knuckles, and, upon occasion, guns. Very little, if any, protection was given the marchers, and no interference on the part of the police officers or sheriff's deputies was made to the white, sometimes armed, hecklers.

After August the scene in Greenville became and remained relatively quiet until the fall of 1965 when, on November 11, a group of Negroes marched along their usual route from the chinaberry tree to the Butler County Courthouse; the evidence is not clear whether they had a permit; however, the police received notice, were present, and there was no disorder. On this same day some of Cottonreader's group sought to dramatize their cause further by lying in front of and behind one of the school buses that hauled Negro students to the all-Negro attended Greenville Training School. Also on November 11 announcements were made in the school classrooms regarding the parades scheduled for that day; some 25 to 30 Negro students left school to participate in the demonstrations.

On Friday November 12 some of the Negro leaders in the Greenville protest movement again went to the training school. This time they disrupted the classroom activities and assembly exer-

cises by unauthorized entrances and by making announcements concerning the scheduled march for that date. The Negro school authorities lost all control and school was completely disrupted. The demonstrators refused to leave the school, and, finally, the police were called. Later that day, there was another march—this time about dusk. Upon this occasion the marchers were disorderly and rowdy; they disregarded the traffic signals, marched in the streets and virtually stopped all vehicular and pedestrian traffic; the congestion was considerable.

In short, from the time these demonstrations were organized in June, 1965, until the submission of this case, the situation in Greenville, Alabama, had deteriorated to such a point that it could be characterized (as it was so characterized by several of the witnesses) as "an explosive situation." *The fault lies on both sides.*

From the evidence in this case this Court now specifically finds that the defendants have failed to discharge their duty and the obligation imposed upon them by the law in the following respects:

(1) By failing to provide proper police protection to the plaintiffs and the members of their class in exercising their constitutional right to protest and to demonstrate against certain alleged grievances;

(2) By allowing hostile white groups to gather and congregate and by permitting these "unknown" individuals to carry knives and guns and to engage in conduct designed to intimidate and having the effect of intimidating the plaintiffs and the members of their class in the exercise of their constitutional right to protest and demonstrate against their alleged grievances;

(3) By imposing and continuing to impose in an unconstitutional manner an arbitrary rule or ordinance requiring the plaintiffs and the members of their class to make formal application for a parade permit prior to the time they ex-

ercise their right to protest and demonstrate.

(4) By using unnecessary and excessive force against the plaintiffs and the members of their race, specifically, their use of tear gas and smoke bombs on August 3 and August 4, 1965;

(5) By failing to permit these plaintiffs and to guarantee to these plaintiffs and the members of their class their constitutional right to picket in a peaceful and in an orderly manner against their alleged grievances, and

(6) By failing to maintain and keep order, generally, when these marches and protests were taking place, with the claim that they did not have an adequate police force to cope with such situations. This claim has been made without any effort on the part of the defendants to seek and obtain assistance from other authorities.

The illegal activity by the plaintiffs and the members of their class has helped create this situation in Greenville and Butler County, Alabama; the plaintiffs' fault is as great as the defendants'. This illegal activity consists of:

(1) Parading and marching in the City of Greenville, Alabama, without giving adequate written notice to the police and city authorities as to the time and route of the proposed march or demonstration;

(2) Failing to parade and demonstrate in an orderly manner and to obey all traffic regulations;

(3) Scheduling and conducting parades and marches at nighttime or near nighttime;

(4) Scheduling and conducting parades and marches on busy streets and thoroughfares in the City of Greenville during peak traffic periods;

(5) Unduly interfering with traffic by sitting and lying on the roads and streets when thwarted in their efforts to march and parade;

(6) Taking school-age Negro students from school or encouraging them to leave

school for the purpose of demonstrating and marching, and

(7) Interfering with the operation of the schools in Greenville, Alabama.

 The acts and conduct of these defendants, together with the members of their respective enforcement agencies as outlined above, have not been directed toward enforcing any valid laws of the City of Greenville, Alabama, or the State of Alabama. By such actions and by this conduct the defendants and the members of their respective organizations have intimidated and harassed these plaintiffs and the members of their class and have permitted unidentified (as far as the evidence before this Court is concerned) white citizens to intimidate, threaten and assault these plaintiffs and the members of their class. The effect of this is to interfere with these plaintiffs and the members of their class in their exercising certain of their basic constitutional rights; that is, the right to assemble peacefully and remonstrate with governmental authorities and to petition for redress of grievances. The attempted marches and demonstrations as originally organized and conducted in Greenville, Alabama, by these plaintiffs and the members of their class involved nothing more than peaceful efforts on their part to exercise a classic constitutional right; that is, the right to assemble peacefully and to petition one's government for the redress of grievances. Under such circumstances suppression by public officials or police of the rights of free speech and assembly cannot be made an easy substitute for the performance of their duty to maintain order by taking such steps as may be reasonably necessary and feasible to protect peaceable, orderly speakers, marchers or demonstrators in the exercise of their rights against violent or disorderly retaliation or attack at the hands of those who may disagree and object. See generally, Brown, et al. v. State of Louisiana, 86 S.Ct. 719 (February 23, 1966); Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Fields v. South Carolina, 375 U.S. 44, 84 S.Ct. 149, 11 L.Ed.2d 107 (1963); Kelly v. Page, 335 F.2d 114 (5th Cir. 1964); NAACP, et al. v. Thompson, et al., 357 F.2d 831 (5th Cir. March 8, 1966); Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D. Calif.1965). Thus, the threat of violence or public hostility to the views of those exercising First Amendment liberties does not of itself justify denial of the right, but rather is grounds for injunctive relief. NAACP, et al. v. Thompson, et al., supra; Kelly v. Page, supra. See Hurwitt v. City of Oakland, supra; Williams v. Wallace, 240 F.Supp. 100 (M.D. Ala., 1965); United States v. Clark, 249 F.Supp. 720, (S.D.Ala., April 16, 1965); United States v. United States Klans, Knights of Ku Klux Klans, 194 F.Supp. 897 (M.D.Ala.1961). Moreover, in discharging their duties and responsibilities of keeping the streets and highways open, public authorities may impose only *reasonable* regulations designed to assure the safety and convenience of the people; they cannot, themselves, in the guise of regulations use the power or influence of their office to abridge or deny basic constitutional rights. Nor can public officials—as this Court and other courts have repeatedly emphasized—"effectively abdicate [their] * * * responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961); Lynch v. United States, 189 F.2d 476 (5th Cir. 1951); United States v. United States Klans, Knights of Ku Klux Klan, Inc., supra; Williams v. Wallace, supra; United States v. Clark, et al., supra. It is clear, therefore, that on the facts and circumstances presented in this case, these plaintiffs, and the members of the class they represent, are entitled to an injunction to insure their safety and security in the free exercise of their constitutional rights. See Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); NAACP, et al. v. Thompson, et al., supra; Kelly v. Page, supra; Wil-

liams v. Wallace, supra; United States v. Clark, supra; United States v. United States Klans, Knights of Ku Klux Klan, Inc., supra.

As indicated previously, however, the rights of free speech and assembly, while fundamental in our democratic society, do not mean that everyone wishing to voice his opinions and beliefs may do so at any place and at any time. The right of the public to be protected from the evils of particular conduct is often a greater and more important right. Those who desire to communicate their ideas by conduct, such as patrolling, marching and picketing on streets and highways, are in this respect in a somewhat different position from those who communicate their ideas by mere speech or written publication. As the Supreme Court stated in Cox v. State of Louisiana, supra, 379 U.S. at 554, 85 S.Ct. at 464:

> The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsbility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did

not agree to listen to their exhortations.

This reasoning was followed in Forman, et al. v. City of Montgomery, 245 F.Supp. 17 (M.D.Ala., 1965), aff'd per curiam, 355 F.2d 930 (5th Cir. February 17, 1966), wherein this Court stated:

> There is no immunity conferred by our Constitution and laws of the United States to those individuals who insist upon practicing civil disobedience under the guise of demonstrating or protesting for "civil rights." The philosophy that a person may—if his cause is labeled "civil rights" or "states rights"—determine for himself what laws and court decisions are morally right or wrong and either obey or refuse to obey them according to his own determination, is a philosophy that is foreign to our "rule-of-law" theory of government. Those who resort to civil disobedience such as the petitioners were engaged in prior to and at the time they were arrested cannot and should not escape arrest and prosecution. Civil disobedience by "civil rights workers" in the form of "going limp" and lying or marching in the streets or upon the sidewalks, or marching around the city hall while night court was in session, singing "freedom" songs or taking to the streets to do their parading and picketing in lieu of using the sidewalks, while failing to make any application to city authorities for a parade permit, is still a violation of the law and subjects the violators to being prosecuted in the courts of the cities and states where such occurs.

A more recent pronouncement of these principles is found in NAACP, et al. v. Thompson, et al., supra, wherein the Court, although having determined that the plaintiffs were entitled to injunctive relief, stated:

> [W]e are also of the opinion that on many occasions valid State laws and municipal ordinances, enacted for the public safety and convenience, were violated by plaintiffs and that their

violation was unnecessary for the full enjoyment of their rights under the Constitution and laws of the United States. * * * Plaintiffs could not transgress valid State laws or municipal ordinances, enacted and enforced in the exercise of legitimate purposes of the State, in the assertion of rights guaranteed by the Constitution and laws of the United States, if they could assert these rights and still respect the State law. 357 F.2d at 833.[4]

■ As indicated, this Court specifically finds that the plaintiffs are equally at fault in bringing about the chaos and violence which has taken place in Greenville. The power of this Court, in the exercise of its equity jurisdiction, to enjoin such illegal conduct—that is, conduct which directly infringes on the important rights of others and conduces to violence—is clearly established.[5] This Court finds it necessary and proper, therefore, to enjoin these plaintiffs from engaging in certain specified activities in order to prevent further immediate and irreparable injury to the rights of others, as well as to minimize the possibility of violence and to secure the public safety.

In accordance with the foregoing and for good cause, it is the order, judgment and decree of this Court that Elton Johnson, Mayor of Greenville, Alabama; E. B. Stafford, Chief of Police of Greenville, Alabama; W. Thomas, Sheriff of Butler County, Alabama, their agents, officers, employees, successors and all persons in active concert and participation with

them be and the same are hereby enjoined from:

(1) Failing to permit and to guarantee to these plaintiffs and the members of the class they represent their constitutional right to demonstrate and picket peacefully and orderly to protest their grievances;

(2) Committing acts of violence upon, or threatening, intimidating, assaulting or harassing any of the plaintiffs and those similarly situated in the exercise of their constitutional rights of free speech, assembly and petition;

(3) Otherwise obstructing, impeding, or interfering with the exercise of said rights, and

(4) Allowing dissident elements to gather and congregate and carry knives, brass knuckles and guns for the purpose of committing acts of violence upon the plaintiffs and those similarly situated, or assaulting, threatening or intimidating them in the exercise of their constitutional rights, or otherwise impeding or interfering with the exercise of said rights.

It is further ordered that plaintiffs R. B. Cottonreader, Rosa Lee Lewis, Fannie Lee Marsh, Margaret Rogers, Charles Cheatham, Emmett Knight, and the members of the class they represent and those acting in concert with them, be and the same are hereby enjoined from:

(1) Parading and marching in the City of Greenville, Alabama, without giving adequate written notice to the police and city authorities as to the time and route of the proposed march or demonstration.

4. These views have been repeatedly enunciated by the Supreme Court. See Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Niemotko v. State of Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Poulos v. State of New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); Edwards v. South Carolina, supra; American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94

L.Ed. 925 (1950); Kelly v. Page, supra; United States v. United States Klans, Knights of Ku Klux Klan, Inc., supra; Crenshaw County Bd. of Education v. Barnett, et al., 251 F.Supp. 917 (M.D. Ala., March 2, 1966).

5. The cases cited supra in the discussion of the obligation of the defendants to refrain from encroaching upon plaintiffs' rights amply support this view. See in particular the decision of this Court in United States v. United States Klans, Knights of Ku Klux Klans, supra.

**500**

(2) Scheduling and conducting parades at nighttime.

(3) Scheduling and conducting parades and marches on busy streets and thoroughfares in the City of Greenville during peak traffic periods which unreasonably delay and snag traffic and thereby infringe upon the rights of others in the use of the public streets and sidewalks, as well as make impossible adequate police protection.

(4) Taking students from school or encouraging them to leave school for the purpose of demonstrating and marching, and in interfering with classroom activities.

It is further ordered that the costs in this proceeding be and they are hereby taxed against the plaintiffs and the cross-plaintiffs equally, for which execution may issue.

It is further ordered that jurisdiction of this matter be and the same is expressly retained.